UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

| | |
|---|---|
| LAVELL BONE, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Cause No. 2:12-cv-80-WTL-WGH |
| | ) |
| MR. DRUMMY, *et al*. | ) |
| | ) |
| Defendants. | ) |

**ENTRY ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

This cause is before the Court on the Defendants' motion for summary judgment (dkt. no. 45). The motion is fully briefed, and the Court, being duly advised, **GRANTS** the motion for the reasons set forth below.[1]

**I.  STANDARD**

Federal Rule of Civil Procedure 56(a) provides that summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." In ruling on a motion for summary judgment, the Court accepts as true the admissible evidence presented by the non-moving party and draws all reasonable inferences in the non-movant's favor. *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009). However, "[a] party who bears the burden of proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial." *Id.* Finally, the non-moving party bears the burden of specifically identifying the relevant evidence of record, and "the court is not required

---

[1] The Defendants' brief in support is entitled "Memorandum in Support of Defendants' Motion to Dismiss and Alternative Motion for Summary Judgment." The Court assumes the Defendants' reference to a motion to dismiss is in error.

to scour the record in search of evidence to defeat a motion for summary judgment." *Ritchie v. Glidden Co.*, 242 F.3d 713, 723 (7th Cir. 2001).

## II. BACKGROUND

The relevant facts of record, viewed in the light most favorable to Lavell Bone, the non-moving party, are as follow.[2]

Before Bone was incarcerated, he sustained an injury to his right eye, and in 2007, he had surgery to remove scar tissue from his retina.[3] Since then, he has suffered from chronic eye problems, including impaired vision in his right eye.

On May 26, 2010, Bone's intake medical screening was conducted at the Federal Correction Complex in Terre Haute. At that time, he had two prescriptions for eye drops.

On July 11, 2010, while in the prison's Barber Shop, Bone was told that his eye was red. At approximately 9:50 a.m., Ryan Drummy, an EMT-Paramedic, was summoned to the Barber Shop to examine Bone's right eye. Bone informed Drummy that he had stopped using his eye drops due to irritation and vision loss in his right eye. Upon examination, Drummy observed a protrusion in Bone's eye that was light blue in color and extended out approximately 4-5mm and was approximate 6mm in length. Drummy contacted a Bureau of Prisons ("BOP") Physician's Assistant ("PA"), who deferred to BOP physician Dr. Wilson. Dr. Wilson prescribed neomycin (antibiotic) eye drops to treat Bone's eye issue. Drummy, however, mistakenly gave Bone neomycin ear drops.[4] Drummy also told Bone to follow-up the next day. When Bone returned to

---

[2] Bone's version of events is somewhat different than the Defendants' version of events. Thus, where the stories differ, Bone's facts are incorporated.

[3] Bone's medical records indicate that he suffered from glaucoma and a radiation induced cataract. Prior to incarceration, Bone was a welder, and he did not use proper eyewear.

[4] The drops contained the same active ingredients; however, the osmolarity of the solutions was different.

2

his cell, believing the medication to be eye drops, he put one drop of the solution into his right eye. Immediately, Bone began experiencing a loss of vision and a painful burning sensation in his right eye. After Bone rinsed his eye with water, he discovered that Drummy had given him ear drops rather than eye drops.

Despite rinsing his eye with water, Bone continued to experience vision loss and a painful burning sensation and asked to see the medical department. Bone, however, was not permitted to see medical personnel until later that day. In the meantime, upon learning of the error, Drummy contacted the PA on duty to discuss the medication mix-up and Bone's prognosis. After speaking with the PA, Drummy did not provide any further medical treatment to Bone.

Throughout the day, Bone continued to experience a burning sensation and loss of vision in his right eye. He also began experiencing a headache, light-headedness, and nausea. When Bone was finally permitted to visit the medical department, he spoke with Christopher McCoy, the Improving Organizational Performance Coordinator ("IOP") at FCC Terre Haute, and informed him about Drummy's mistake. He complained that the pain and vision loss from the ear drops was severe. Bone demanded immediate medical attention; however, McCoy told Bone that he would have to wait until the following day to receive medical treatment for his eye problems. Before the day was over, Bone once again complained about his symptoms to McCoy. As before, McCoy refused to provide any medical treatment.

On July 12, 2010, Bone was examined by a Mid-Level Provider ("MLP"). The MLP noted as follows:

> Patient seen today for evaluation of his (R) eye. Cornea of the eye bulging and cloudy in appearance with no vision. Claimed that he started having this problem after working with the welding. Pt. has glaucoma and [sic] most likely the cause of the bulging is due to increase in intraocular pressure and the flash burn.

> Currently on medication --- Cortisporin ophth. drops and also other medication for his glaucoma. Pt. will be sent out to see the eye specialist today, ASAP.

Dkt. No. 45-63, p. 34. Thereafter, Bone was seen by an offsite ophthalmologist. The ophthalmologist prescribed additional eye drops to alleviate Bone's symptoms. He was also given an eye shield and instructed to wear it at all times. The same day, Bone complained to Julie Beighley, the Health Services Administrator at FCC Terre Haute, about Drummy's mistake regarding the ear drops and his resulting eye issues. Beighley, who was responsible for administrative tasks in the health department and not direct inmate care, refused to provide any medical treatment. According to Bone, however, she did provide him with an eye patch during one of their discussions.

The following day, McCoy observed Bone not wearing his eye shield. Bone complained that the tape he was given was "not any good." Bone also told McCoy that the ophthalmologist the previous day told him that he required eye surgery within the next two weeks or he faced permanent vision loss. McCoy gave Bone more tape and contacted the ophthalmologist's office regarding Bone's surgery claim. The ophthalmologist's office reported that there was no mention of surgery, but that Bone should be seen by a cornea specialist "ASAP." That same day, Bone once again complained to Beighley about his symptoms and about how he had not received any pain medication. Again, however, Beighley refused to provide any medication or treatment.

On July 20, 2014, Bone approached McCoy and/or Beighley and complained of light sensitivity, headaches, and eye pain.[5] Bone was given Tylenol, and instructed to follow up at sick call as needed.

---

[5] Bone claims he spoke with Beighley. The Defendants claim that he spoke with McCoy. The identity of the individual, however, is not critical to the Court's analysis.

4

On September 3, 2014, Bone was seen by Robert Deitch, Jr., a cornea specialist. Dr. Deitch opined and recommended as follows:

> Mr. Bone's past ocular history is significant for what must have been a pars plana vitrectomy with endolaser and silicone oil instillation OD[6] in 2000. . . . This was likely performed for a retinal detachment. Mr. Bone has glaucoma OD . . .
>
> The anterior segment evaluation of the right eye reveals a cornea with moderate opacification due to edema and thickening. The overlying epithelium is intact. The anterior chamber is deep and quiet. Emulsified silicone oil is noted in the superior aspect of the anterior chamber. The intraocular pressure is 34mmHg. The lens of this eye exhibits mild nuclear sclerosis with moderate posterior subcapsular opacification. . . .
>
> M. Bone's ocular diagnoses include keratoconus OU with dydrops OD, status-post vitrectomy with silicone oil installation likely for a retinal detachment OD, cataract OD, and glaucoma OD.
>
> Mr. Bone and I discussed his keratoconus OS.[7] This is best managed with glasses and/or contact lenses for possible improvement in vision.
>
> With regards to the right eye, the corneal hydrops[8] will gradually heal with corneal scarring. The glaucoma is likely either caused by or exacerbated by the emulsified silicone oil within the anterior segment. It would be reasonable to have Mr. Bone see a retina specialist for consideration of removal of the silicone oil—and thus better control of the glaucoma. The visual potential from this right eye is unclear since the retina and optic nerve cannot be seen. There may be significant retinal damage from Mr. Bone's previous detachment or optic nerve damage due to his glaucoma that would limit the vision. If this eye was thought to have good potential, then a corneal transplant could be performed. The corneal opacification and possible subsequent transplant are not a pressing issue (and are not time sensitive). Currently, the glaucoma is the most important issue.

Dkt. No. 45-3, p. 50.

---

[6] OD refers to the right eye, OS refers to the left eye, and OU refers to both eyes.

[7] "Keratoconus is a disorder in which the cornea assumes an irregular conical shape." Hiroko Suzuki, M.D. and John Robert Minarcik, M.D., *Keratoconus Complicated by Acute Corneal Hydrops*, THE NEW ENGLAND JOURNAL OF MEDICINE (Oct. 15, 2009), available at http://www.nejm.org/doi/full/10.1056/NEJMicm0805963.

[8] "Acute hydrops is a well-known complication, occurring in approximately 3% of patients with keratoconus. Hydrops occurs after rupture of the posterior cornea leads to an influx of aqueous humor into the cornea, resulting in edema. Corneal edema typically resolves in 6 to 10 weeks." *Id.*

On October 7, 2010, Bone was scheduled for a follow-up appointment with Dr. Deitch. Bone, however, did not appear for the scheduled appointment. Bone nonetheless continued to complain to Beighley about problems with his right eye. Eventually, on January 12, 2011, Bone had surgery on his right eye. Bone maintains that he continues to suffer pain and loss of vision in his right eye "as a result of the incorrect medication." Bone's Resp. at 4.

### III. DISCUSSION

Bone filed the instant *Bivens* action against Drummy, McCoy, and Beighley alleging that each Defendant was deliberately indifferent to his medical needs "in violation of the Eighth Amendment's prohibition against cruel and unusual punishment."[9] *Id.* at 5. The Defendants, however, argue that they are entitled to qualified immunity. "The threshold question concerning a qualified immunity defense is whether there is any merit to the underlying constitutional claim." *Norfleet v. Webster*, 439 F.3d 392, 395 (7th Cir. 2006) (citation omitted).

"To sustain [a] claim of deliberate indifference in violation of the Eighth Amendment, [a plaintiff] must show 'that he had a serious medical need and that a defendant was deliberately indifferent to it.'" *Id.* (quoting *Garvin v. Armstrong*, 236 F.3d 896, 898 (7th Cir. 2001)). Bone's complaint and the summary judgment briefs appear to focus solely on the ear drops that were given to Bone by mistake and the pain and vision loss he relates to the ear drops being in his eye. In other words, Bone claims that his eye pain and vision loss were related to the ear drops, rather than his underling eye issues. The Court, however, finds that there are really two separate medical concerns at issue in this case: (1) the pain and loss of vision associated with the ear

---

[9] The Supreme Court recognized in *Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971), that individuals may file suit against federal government officials who have violated their constitutional rights.

drops being placed in Bone's eye and (2) Bone's preexisting and underlying eye issues (i.e., his glaucoma, keratoconus, and corneal hydrops).

With regard to the ear drops, Bone cannot satisfy the foregoing standard because he did not have a serious medical need. "An objectively serious medical need is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Wynn v. Southward*, 251 F.3d 588, 593 (7th Cir. 2001) (citations and quotations omitted). Bone's ear drop issue is neither of these. In this regard, eye specialist, Dr. Raj Maturi opined that

> Mr. Bone's eye disease is long standing, chronic and incurable with current technology. His use of otic (as opposed to Opthalmic drops) has not caused any permanent visual loss. At most, it may have caused minor temporary irritation from a possible difference in osmolarity between the two suspensions. This temporary irritation would likely be minor and very short lived.

Dkt. No. 45-5. In short, Bone's eye irritation from the ear drops was not sufficiently serious under the standard.[10] *Cf. Jackson v. Pollion*, 733 F.3d 786, 789 (7th Cir. 2013) (plaintiff's complaints of bloody noses, loss of vision, and visual disturbances from a failure to provide blood pressure medication during three week period not a serious medical need).

Bone's preexisting and underlying eye issues, on the other hand, are objectively serious medical concerns. As noted by Dr. Maturi, Bones underlying eye issues are "long standing" and "chronic." Bone, however, has not shown (and really has not even argued) that the Defendants were deliberately indifferent to his needs as they related to his glaucoma, keratoconus, and corneal hydrops.

---

[10] The Court acknowledges that Drummy did, in fact, make a mistake giving Bone ear drops instead of eye drops, which caused Bone to experience some temporary eye irritation. However, "[n]egligence—even gross negligence—is insufficient" to establish deliberate indifference. *King v. Kramer*, 680 F.3d 1013, 1018 (7th Cir. 2012). Accordingly, Drummy is not liable to Bone simply for giving Bone the ear drops.

In order to survive summary judgment, Bone must "demonstrate a genuine issue of fact on the question whether the [Defendants] were aware of [his] serious medical need and were deliberately indifferent to it." *King*, 680 F.3d at 1018 (citing *Wynn*, 251 F.3d at 593). "A medical professional's deliberate indifference may be inferred when 'the medical professional's decision is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible did not base the decision on such a judgment.'" *Id.* at 1018-19 (quoting *Estate of Cole by Pardue v. Fromm*, 94 F.3d 254, 261-62 (7th Cir. 1996)).

> In evaluating the evidence, we must remain sensitive to the line between malpractice and treatment that is so far out of bounds that it was blatantly inappropriate or not even based on medical judgment. Although this is a high standard, [a plaintiff] is not required to show that he was "literally ignored."

*Id.* at 1019 (quoting *Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005)). Additionally, for a delay in medical treatment to rise to the level of deliberate indifference, the plaintiff "must place verifying medical evidence in the record to establish the detrimental effect of the delay in medical treatment." *Walker v. Benjamin*, 293 F.3d 1030, 1038 (7th Cir. 2002) (citing *Langston v. Peters*, 100 F.3d 1235, 1240 (7th Cir. 1996)).

Here, no reasonable juror could find that the Defendants were deliberately indifferent to Bone's underlying eye issues. After Drummy examined Bone's eye on July 11, 2010, he contacted other medical personnel immediately and gave Bone what he thought were eye drops. Bone was seen by an ophthalmologist the following day. Approximately seven weeks later, he was seen by a cornea specialist, and he had surgery on January 12, 2011. To the extent Bone complains that there was a delay in treatment or surgery, or in seeing an ophthalmologist or eye specialist, there is no evidence that the delays were detrimental to his eye issues.

Additionally, Bone claims that the Defendants refused to provide him with pain medication or any other medical treatment after he placed ear drops into his eye. There is no

evidence, however, that the ear drops aggravated or exacerbated his underlying eye issues. Moreover, there is no evidence that pain medication or other medical treatment was warranted between July 2010 and January 2011. Therefore, Bone fails to demonstrate a genuine issue of fact as to whether the Defendants were deliberately indifferent to his underlying eye issues.

To the extent Bone's complaint also includes a claim against McCoy and/or Beighley based on a theory of respondeat superior, that claim also fails for the reasons discussed above. *See Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009) ("Because vicarious liability is inapplicable to *Bivens* and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."). The Court has already determined that Bone cannot survive summary judgment on his claims against each Defendant.

Additionally, to the extent Bone's complaint contains a claim against Beighley for failing to talk "the warden out of transferring [him]," his claim also fails. Shortly after Bone had surgery on his right eye, he was transferred to the United States Penitentiary in Lewisburg. He alleges that after his transfer, his treatments were delayed, and, as a result, he continues to suffer from lightheadedness, dizziness, nausea, headaches, and blindness in his right eye. Compl. at pp. 24-25. No evidence, medical or otherwise, has been provided to support this argument. Moreover, federal prisoners may be transferred "from one place of confinement to another at any time for any reason whatsoever or for no reason at all." *Brown-Bey v. United States*, 720 F.2d 467, 470 (7th Cir. 1983).

Based on the foregoing, the Defendants are entitled to summary judgment on each of Bone's claims.

## IV. CONCLUSION

For the reasons set forth above, the Defendants' motion for summary judgment (dkt. no. 45) is **GRANTED**.

SO ORDERED: 07/18/2014

*William T. Lawrence*

Hon. William T. Lawrence, Judge
United States District Court
Southern District of Indiana

Copies to all counsel of record via electronic communication.